IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:06CR78 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| AUGUST J. DALLAS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Defendant's statement of appeal (Filing No. 31) from the Magistrate Judge's order (Filing No. 29) requiring that the Defendant, August J. Dallas, receive treatment, including the administration of antipsychotic medication, for his medical well-being and to restore his competence to stand trial. The appeal is supported by a brief (Filing No. 32). The Court has also considered the government's response (Filing No. 33).

## FACTUAL BACKGROUND

On March 22, 2006, Dallas was charged in an Indictment with two counts of bank robbery in violation of 18 U.S.C. § 2113. (Filing No. 1.) On May 2, 2006, defense counsel[1] moved for a competency hearing pursuant to 18 U.S.C. § 4241(a), stating that Dallas was found incompetent after undergoing a psychiatric evaluation. (Filing No. 12.) On May 11, 2006, Magistrate Judge F.A. Gossett found Dallas incompetent to stand trial and committed him under 18 U.S.C. § 4241(d) to the custody of the Attorney General for hospitalization and treatment in a suitable facility not to exceed four months to determine,

---

[1]Dallas initially was represented by a federal public defender. On May 8, 2006, the federal public defender's motion to withdraw was granted. (Filing No. 16.) On April 21, 2006, Steven E. Achelpohl entered his appearance. Mr. Achelpohl continues to represent Dallas.

among other things, whether Dallas might become competent to stand trial. (Filing No. 22.) On August 7, 2006, Judge Gossett ordered a hearing regarding Dallas's treatment (Filing No. 24), and the hearing was held on September 21, 2006. The following witnesses testified: Dr. Richart L. DeMier, a psychologist at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP"); and Dr. Robert Sarrazin, chief psychiatrist at USMCFP. (Filing No. 28.)

Dr. DeMier testified that he saw Dallas regularly at least once weekly for the first few weeks that he was at USMCFP. Dr. DeMier estimated that he spent five one-hour sessions with Dallas. (Filing No. 30 ("Tr."), at 13.) Dallas's symptoms suggested paranoid schizophrenia, a chronic illness expected to worsen absent treatment. (Tr. 5-6.) Dr. DeMier opined that Dallas's illness hinders his competence insofar as these proceedings are concerned because: Dallas's thoughts are disorganized; it is difficult for listeners to follow his attempts to communicate, and he becomes impatient; and delusions might affect his ability to consult with his attorney. (Tr. 6-7.) Dr. DeMier stated that the primary benefit from treatment with respect to Dallas's competence would be improved organizational thinking and removal of delusional beliefs. (Tr. at 8-9.) Dr. DeMier opined that it is "substantially likely," or "likely," that medication would render Dallas competent to stand trial. Dr. DeMier noted, however, that the effect of medication on Dallas's competence is difficult to predict without knowing whether Dallas has had any prior treatment and, if so, the history of such treatment. (Tr. 9 & 11.) Dr. DeMier admitted that Dallas suffers from "fixed" or consistent delusions and that such delusions can be difficult to treat. (Tr. 20.) More specifically, Dr. DeMier testified that approximately 75 to 80% of those persons treated at USMCFP are restored to competence. (Tr. 18.) Dr. DeMier estimated that

treatment would take approximately four to eight months. (Tr. 11.) Dr. DeMier stated that he did not believe that psychiatric medications would cause unfavorable side effects that would undermine the fairness of a trial. (Tr. 10.) Dr. DeMier stated that side effects associated with antipsychotic medications are generally "nuisance" effects such as stiffness, dry mouth or blurry vision, and such effects can be treated with other medications. (Tr. 17.) He added that more severe side effects are generally associated with an older group of medications that would not be used in Dallas's treatment. (Tr. 17.) He testified that other treatment alternatives are not available to restore Dallas's competence. (Tr. 10-11, 18.) Dr. DeMier noted that Dallas did agree to take the antipsychotic medication Abilify. However, Dr. DeMier stated that Dallas took one dose, complained of side effects not usually associated with that medication, and opted not to continue the medication. (Tr. 11-12.) Dallas was asked to try a second medication, and he refused to do so voluntarily. (Tr. 12.)

Dr. Sarrazin testified that he interviewed Dallas for a total of one hour, and he has discussed Dallas's case with Dr. DeMier for a total of one hour. (Tr. 28.) Dr. Sarrazin opined that Dallas suffers from schizophrenia, and treatment with antipsychotic medications is the treatment of choice for Dallas's condition. (Tr. 29.) Dr. Sarrazin characterized the goal of treatment to allow Dallas to "become more interactive, more able to attend to his trial, more able to interact with his attorney." (Tr. 30.) Dr. Sarrazin added that any side effects from the antipsychotic medications being considered are generally minor and disappear within a week or can be minimized by various strategies with respect to the dosage and timing of the medications. (Tr. 29-30.) Dr. Sarrazin stated that Dallas's complaint of becoming "ill" as a result of the medication was inconsistent with the

medication and accompanied by Dallas's statement that he refused to take the medication any longer.  Dr. Sarrazin added that he prefers that patients become accustomed to a new medication by taking the medication consistently for a period of three to four days.  Dr. Sarrazin expressed the opinion that Dallas did not have a reaction to the medication, but rather did not want to take it. (Tr. 33-34.)  Dr. Sarrazin testified that if Dallas experienced more severe side-effects, appropriate measures would be taken.  For example, the dosage would be changed, or Dallas would be taken off the medication(s) and rendered incompetent. (Tr. 30.)  He stated that Dallas's hepatitis B condition is not unusual for a person with a chronic mental illness such as schizophrenia and would be a factor in choosing a medication. (Tr. 36.)  Dr. Sarrazin opined that medication would render Dallas competent to assist in his defense at trial. (Tr. 31.)  Dr. Sarrazin testified that over a "period of time" approximately between 75 and 80% of involuntarily medicated patients achieve competency, a result he described as "very good." (Tr. 32.)

No documentary evidence was offered at the hearing. (Filing No. 30.)   On September 21, 2006, Judge Gossett issued a written order, finding the following:

> 1.   August J. Dallas is required to receive, involuntarily, anti-psychotic medications which may render him competent to stand trial on two counts of bank robbery, which I determine to be serious offenses.
>
> 2.   That such treatment is medically appropriate with a 75% success rate, and if not allowed, could result in permanent damage to Dallas.
>
> 3.   The proposed medication is substantially unlikely to have any side effects undermining the fairness of the trial or further reducing Dallas' ability to communicate with counsel.  Specifically I find treatment with anti-psychotic medication is appropriate and will result in minimal side effects.
>
> 4.   In this case, anti-psychotic medications represent the least intrusive alternative to further important government trial-related interests, the health of Dallas, and no alternative treatment program is available.

>    5.   Dallas is not a dangerous person and the sole reason for the proposed treatment program is not that he may regain competency and stand trial. On the contrary, the evidence supports a finding that the treatment is medically appropriate and if not followed could result in permanent damage to Dallas.

(Filing No. 29.)

Judge Gossett ordered that Dallas "be required to receive treatment, including the involuntary administration of antipsychotic medication for his medical well-being and to restore his competency to stand trial." (Filing No. 29.) Judge Gossett stayed his order pending appeal.

On October 2, 2006, Dallas appealed from Judge Gossett's order, arguing that the order violates his Fifth Amendment due process rights. Specifically, Dallas argues that the evidence failed to show: the administration of antipsychotic drugs is medically appropriate; the drugs would be substantially unlikely to have side effects that undermine the fairness of the trial; and less intrusive means are not available to restore competency. (Filing No. 31.)

## STANDARD OF REVIEW

When a party appeals a magistrate judge's nondispositive order pursuant to 28 U.S.C. § 636(b)(1)(A) and NECrimR 57.2, the court reviews the order under the clearly erroneous or contrary-to-law standard. 28 U.S.C. § 636(b)(1)(A); NECrimR 57.2(c). However, in considering an involuntary medication issue, the Ninth Circuit Court of Appeals determined that the Federal Magistrates Act does not contemplate that a magistrate judge may issue a final order in a matter regarding the involuntary administration of medication. *United States v. Rivera-Guerrero,* 426 F.3d 1130, 1136 (9th Cir. 2005) (citing *United States v. Rivera-Guerrero,* 377 F.3d 1064 (9th Cir. 2004)). The Tenth Circuit, while not deciding

the issue, recognized the Ninth Circuit's conclusion. *United States v. Morrison,* 415 F.3d 1180, 1185 (10th Cir. 2005). Out of an abundance of caution, to ensure that this Court fully complies with the Federal Magistrates Act, and given the potential effect of this matter on further proceedings, I will conduct a de novo review pursuant to NECrimR 57.3(a) and consider the Magistrate Judge's order as a report and recommendation. *Rivera-Guerrero,* 426 F.3d at 1136; *Morrison,* 415 F.3d at 1185. The report and recommendation may be adopted, overruled, or remanded to the magistrate judge for further proceedings. 28 U.S.C. § 636(b)(1); NECrimR 57.3.

## DISCUSSION

One has a Fifth Amendment due process interest in rejecting the administration of antipsychotic medication. *Washington v. Harper,* 494 U.S. 210, 221-22 (1990). Before this Court may authorize the involuntary administration of antipsychotic medication to render the Defendant competent to stand trial, the government bears the burden of showing each of the following factors discussed below:

> (1) important government interests are at stake; (2) involuntary medication is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial; (3) involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and (4) the administration of the drugs is medically appropriate.

*United States v. Ghane,* 392 F.3d 317, 319 (8th Cir. 2004) (citing *Sell v. United States,* 539 U.S. 166, 180-82 (2003), hereafter referred to as the "*Sell* test.").

6

**IMPORTANT GOVERNMENTAL INTERESTS**

An important governmental interest exists when one is accused of a "serious" crime and "special circumstances" do not undermine the government's interest in trying the defendant for that crime. *United States v. Evans,* 404 F.3d 227, 236 (4th Cir. 2005). The seriousness of a crime is measured by its maximum statutory penalty. *Id.* at 237. A statutory maximum term of ten years imprisonment has been considered to represent a "serious" crime. *Id.* at 238.

Dallas faces two counts of bank robbery charged pursuant to 18 U.S.C. § 2113. Both counts charge that the robberies were committed by "force, violence and intimidation," and therefore both counts implicate 18 U.S.C. § 2113(a) and a corresponding statutory maximum sentence of twenty years per count.

Dallas argues that the prospect of lengthy confinement due to the possibility of a severe mental disorder mitigates any governmental interest in timely prosecuting Dallas, given the potential term of imprisonment. (Filing No. 32, at 8.) However, the time Dallas has already served since his March 23, 2006, arrest does not significantly minimize the government's interest in trying him, as the seven months he has spent in custody do not significantly decrease his potential sentence, if convicted. *See Evans,* 404 F.3d at 239 (the defendant's two-year confinement period for evaluation did not significantly decrease the government's interest, where the defendant faced a ten-year statutory maximum period of imprisonment). I decline to speculate about how much time Dallas might spend in confinement in a mental health facility due to his severe mental disorder if that disorder

7

remains untreated. I conclude that important governmental interests are at stake in this matter.

**SUBSTANTIAL LIKELIHOOD OF COMPETENCE; EXISTENCE OF INTERFERING SIDE EFFECTS**

In *United States v. Gomes,* 387 F.3d 157, 161 (2d Cir. 2004), the court concluded that a 70% chance of restoring a defendant's competence through antipsychotic medications was a sufficient likelihood of success to satisfy the second factor of the *Sell* test. The *Gomes* court noted in particular the district court's reference to the Bureau of Prisons' 70% success rate in restoring competence with antipsychotic medication, both on voluntary and involuntary bases. *Id.* at 161-62. Not all courts, however, have viewed such statistics as sufficient. *Rivera-Guerrero,* 426 F.3d at 1136 & 1140 (stressing the Supreme Court's requirement under *Sell* of the importance of a complete factual record including details of drugs to be used as well as their side effects and appropriateness).

In Dallas's case, Dr. DeMier testified as follows:

Q. . . . . [H]ow would Mr. Dallas likely benefit from treatment with medications?

A. I think that there many ways that he would benefit. Probably the most important would be he would be able to think more rationally about his case, about the defenses he would have available to him and about which defenses are most viable in the absence of his delusional beliefs.

He also reports some bizarre perceptual experiences which I think run the risk of distracting him during a courtroom proceeding, and as a result of those experiences, and specifically I'm talking about hallucinations, those might hinder his ability to concentrate and attend to what's going on around him.

I think the main benefit, though, would be improvement in the organization of his thoughts and the – the removal of the delusional

> beliefs or at least their attenuation to the point that they're not the driving force behind his decision making.
>
> Q.    And, Dr. DeMier, do you again to a reasonable degree of medical certainty believe that Mr. Dallas – or treatment of Mr. Dallas with these medications would substantially likely render him competent for trial?
>
> A.    I think it's substantially likely. Given that we don't know a whole lot about his treatment history or that he doesn't have much of a treatment history, it's really difficult to predict in an individual case how an individual's going to respond to this type of treatment.
>
> Obviously, everybody is different, and with psychiatric illnesses people tend to respond differently to different medications or different combinations of medication . . . .

(Tr. 8-9.)

Dr. Sarrazin testified as follows:

> Q.    . . . [D]o you think administering this medication will substantially – well, will it likely return Mr. Dallas to a state of competence to assist his lawyer with trial preparation?
>
> A.    Yes.
>
>       . . . .
>
> A.    It's fair to say that of the numbers of – of patients that the Bureau had over a period of time that we had to involuntary medicate, 75 to 80 percent of those individuals were able to achieve competency and to go on to trial.

(Tr. 31-32.)

Dr. Sarrazin stated that side effects were likely to be minimal and decrease over a period of days as Dallas would become used to the medication. (Tr. 33.)

9

Neither Dr. DeMier nor Dr. Sarrazin referred to specific medications that would be administered. The only specific medication referred to was Abilify, which Dallas refused to take after one administration.[2]

Interpreting Sell, other courts have required more detail with respect to the specific medication proposed to be administered to an incompetent defendant. *See, e.g., United States v. Evans,* 404 F.3d 227, 240 (4th Cir. 2005) (stating that absent such information the government could not prove the second prong of the *Sell* test). And the *Sell* Court specifically stated with respect to the second prong of its test:

> [A court] must find that administration of *the drugs* is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of *the drugs* is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

539 U.S. at 181 (emphasis added).

And finally, in discussing the fourth prong of the test, the *Sell* Court stated that "[t]he *specific kinds of drugs* at issue may matter here [in discussion of the fourth prong] as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success."

*Id.* (emphasis added).

Absent testimony from Dr. Sarrazin regarding specific medications as well as his personal experience with similar cases using those medications, it is difficult to determine the likelihood that Dallas will achieve competency. The task is made more difficult in light of the lack of history of any of Dallas's past treatment efforts, if any, and the fact that Dallas

---

[2] Dr. Sarrazin testified that Dallas's complaint of being "ill" as a result of the Abilify was inconsistent with the medication. Dr. Sarrazin stated that his medical opinion is that Dallas did not experience a reaction; rather, "[i]t was just simply him not wanting to take the Abilify." (Tr. 33.)

appears to suffer from "fixed" or consistent delusions that the medical professionals acknowledge are difficult to treat. The testimony describing a 75-80% success rate appears to refer to the general population at USMCFP, regardless of the mental illness at issue or the specific medication used. Moreover, it is difficult to address the issue of potential side effects without knowing what medication(s) would be administered to Dallas.

### NECESSARY TO FURTHER THE GOVERNMENT'S INTERESTS

In deciding whether an involuntary medication regimen is necessary to further the government's interests, a court must: find that "less intrusive means are unlikely to achieve substantially the same results." *Sell,* 539 U.S. at 181.

Dr. DeMier testified that it is unlikely that Dallas would become competent without antipsychotic drug therapy. (Tr. 18.) Dr. Sarrazin testified that antipsychotic medications are the treatment of choice for Dallas's condition. (Tr. 29.) I conclude that the record does support a conclusion that involuntary medication of Dallas is necessary to further the government's important interests, and that less intrusive means are unlikely to achieve substantially the same results.

### MEDICAL APPROPRIATENESS

Again, because the record does not include information regarding specific medications that might be used to treat Dallas, I cannot determine whether the proposed course of treatment, consisting of the administration of antipsychotic medication, is medically appropriate. *See, e.g., Evans,* 404 F.3d at 240 (stating that absent such information the government also could not prove the fourth prong of the *Sell* test); *United States v. Mackie,* 117 Fed. Appx. 860, 862 (4th Cir. 2004) (discussing a specific proposed

11

medication and its possible side effects), *cert. denied,* 544 U.S. 955 (2005); *United States v. Ballesteros,* 2006 WL 224437, at \*\*1 & 3 (U.S.D.C. E.D. Cal. Jan. 25, 2006) (discussing specific proposed medications); *United States v. Milliken,* 2006 WL 2945957, at \*\*13-14 (U.S.D.C. M.D. Fla. July 12, 2006) (describing a specific plan of treatment including the types of drugs to be used, their side effects, and measures such as physicals and blood tests to ensure that the defendant would not be plagued by unreasonable side effects).

## CONCLUSION

For the reasons discussed, I conclude that (1) the government has not met its burden of proving the second prong of the *Sell* test, *i.e.*, that the administration of *a drug or drugs* would be substantially likely to render Dallas competent to stand trial, but substantially unlikely to cause side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense, and (2) the government has not met its burden of proving the fourth prong of the *Sell* test, *i.e.*, that the administration of the *specific kinds of drugs* at issue is medically appropriate. Therefore, this matter is remanded to Magistrate Judge Gossett for further evidentiary hearing consistent with this memorandum and order. Following the supplemental hearing, Judge Gossett will file a new report and recommendation.

IT IS ORDERED:

1.      This matter is remanded to Magistrate Judge Gossett for further evidentiary hearing consistent with this memorandum and order;

2. The Defendant's objections (Filing No. 31) are granted insofar as this matter is remanded to the Magistrate Judge for further evidentiary hearing, and otherwise denied without prejudice;

3. The time continues to be excluded for purposes of computing the limits under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(A); and

4. A copy of this order shall be sent to Dr. Richard DeMier and Dr. Robert Sarrazin at the U.S. Medical Center for Federal Prisoners, P.O. Box 4000, Springfield, Missouri 65801-4000.

DATED this 6th day of November, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge