## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **8:06CR78** |
| vs. | ) | |
| | ) | **REPORT AND** |
| AUGUST J. DALLAS, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

In accordance with Order No. 34, this matter is before the magistrate judge for supplemental proceedings related to the defendant's Motion to Determine Mental Competency (#12).   An evidentiary hearing began on February 7, 2007 and was held open to allow defendant to file additional evidentiary materials.  The transcript of the February 7, 2007 proceeding was filed at No. 47.  The evidentiary hearing was concluded on June 22, 2007 and the matter was deemed submitted on July 20, 2007, upon the filing of the supplemental transcript (#70).

The defendant, August J. Dallas, is charged with two counts of bank robbery.  *See* 18 U.S.C. § 2113.  On May 11, 2006, the undersigned found Dallas to be incompetent to stand trial and entered an order committing him to the custody of the Attorney General for hospitalization and treatment in a suitable facility pursuant to 18 U.S.C. § 4241(d). The subject of the defendant's treatment was reviewed by the court on September 20, 2006, at which time an evidentiary hearing was held as to whether the defendant should be required to required to receive antipsychotic medication involuntarily.  *See Sell v. United States*, 539 U.S. 166, 180-82 (2003).

Based on the evidence presented on September 20, 2006, I ordered that the defendant was required to receive treatment, including the involuntary administration of antipsychotic medication

for his medical well being and to restore his competency to stand trial. *See* Order No. 29. The defendant objected to the order and, in Filing No. 34, Judge Smith Camp granted the objection insofar as the matter was remanded to the undersigned for further evidentiary hearing.

## A.   Issues Presented

Under *Sell v. United States*, the court may authorize the involuntary administration of antipsychotic medication to render the defendant competent to stand trial, if the government proves each of the "*Sell* factors":

> (1) important government interests are at stake; (2) involuntary medication is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial; (3) involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and (4) the administration of the drugs is medically appropriate.

*United States v. Ghane*, 392 F.3d 317, 319 (8th Cir. 2004) (citing *Sell v. United States*, 539 U.S. at 180-82).

Judge Smith Camp determined that the prior record satisfactorily demonstrated that important governmental interests are at stake in this matter and supported a conclusion that involuntary medication of the defendant is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results.

The elements requiring further evidence were  (a) whether the administration of a drug or drugs would be substantially likely to render the defendant competent to stand trial, but substantially unlikely to cause side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense and (b) whether the proposed course of treatment, consisting of the administration of antipsychotic medication, is medically appropriate.

### B.   Burden of Proof

As most recently noted in *United States v. McCray*, 474 F. Supp. 2d 671, 676-77  (D.N.J. 2007), the Supreme Court did not decide what standard of proof applies in evaluating the *Sell* factors; however, other courts have applied a "clear and convincing" standard.  *See United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005).  In *United States v. Ghane*, the Eighth Circuit declined to determine the applicable standard because it found the government had failed to sustain its burden under either a "preponderance" or "clear and convincing" standard of proof.

Given the importance of the constitutional interests at issue, and in the absence of binding precedent, I find it appropriate to apply the clear and convincing standard.

### C.   Supplemental Facts – February 7, 2007 Hearing

#### 1.   Government's Expert

Dr. Robert Sarrazin, the Chief of Psychiatry at United States Medical Center for federal prisoners in Springfield, Missouri, was recalled to testify.  He testified that the defendant suffers from chronic paranoid schizophrenia and was committed to the Springfield facility for "competency restoration treatment."  (Tr. at 6)[1].  Dr. Sarrazin explained that the defendant's condition causes him to have auditory hallucinations and to believe that things that occur around him have special influence and special meaning, and his condition hinders his ability to proceed with this case.  On cross-examination, he agreed that the defendant's primary symptoms are hallucinations and fixed delusions that have been present for a long period of time.

---

[1]Citations are to the February 7, 2007 hearing transcript, Filing [47].

-3-

According to Dr. Sarrazin, the treatment of choice for chronic paranoid schizophrenia is to administer antipsychotic medications.  Antipsychotic medications would benefit the defendant in that they would "improve his thinking" so he would not be so disorganized and tangential.  Such medication would also improve defendant's auditory hallucinations and visual misinterpretations to the point where he could proceed to trial.  (Tr. #47 at 7-8).

Dr. Sarrazin has had prior experience administering antipsychotic drugs.  Prior to his employment with the Bureau of Prisons, he was employed as a staff psychiatrist at a community mental health center, where he had "a large case load of individuals requiring antipsychotic medications, chronic paranoid schizophrenia, individuals that were on second-generation antipsychotics, first-generation antipsychotics, long-acting medications where they came to the clinic once every two weeks or three weeks or four weeks; people involved in different programming, residential treatment and that."  (Tr. #47 at 17-18).  After his employment with the Bureau of Prisons, he has been involved in the treatment of "a large number of individuals with psychotic disorders, chronic paranoid schizophrenia, both sentenced individuals that are referred to us from other institutions that require treatment, both volunteer and involuntary treatment, after commitment by the courts."  He has treated hundreds of patients with a condition similar to that of the defendant.  Over the past four years, Dr. Sarrazin has been involved in approximately 30 cases regarding the restoration of competency for purposes of standing trial.  (Tr. #47 19).

Dr. Sarrazin testified briefly regarding the development of "first generation" and "second generation" antipsychotic drugs. First-generation antipsychotics have extrapyramidal side effects, e.g., stiffness, shakiness, akathisia (a feeling that one's feet have to keep moving), and a higher risk of tardive dyskinesia (involuntary movements of the tongue and mouth).  The second generation

-4-

drugs were developed to minimize these side effects. Apparently, the drugs Abilify, Geodon, Risperdal (risperidone), Clozaril, Zyprexa and Seroquel are all second-generation antipsychotic medications. (Tr. #47 at 8-9).

Dr. Sarrazin acknowledged that the defendant was admitted to Bellevue Hospital Center ("Bellevue") for about six weeks in February of 2004. (Tr. #47 at 9). Based on information provided directly from the defendant, Dr. Sarrazin testified that the medications defendant took at Bellevue were " haloperidol, risperidone, and he was released on Seroquel according to his report." (Tr. #47 at 26). Dr. Sarrazin was unable to testify regarding any "specifics" in regards to dosing, compliance issues, or follow-up, as he had never reviewed the defendant's medical records from Bellevue. (Tr. #47 at 9 & 26-27). Thus, he did not know whether the defendant's delusions cleared as a result of any medications administered at Bellevue, although such information would be relevant in developing a treatment plan: "[W]hen we're addressing medications with an individual such as Mr. Dallas, we want to look at the history. If they responded to a medication in the past, that's kind of where you want to start." (Tr. #47 at 15). Nor did he know whether risperidone affected defendant's liver enzymes or whether defendant had any other reactions or side effects to the drugs that were administered to him at Bellevue. (Tr. #47 at 29).

At the Springfield facility, defendant agreed to a trial of Abilify, took one dose, and reported the sensation of vomit and cold sweats. Those are not typical side effects of Abilify, and Dr. Sarrazin indicated he believed the defendant simply did not want to take the medication. (Tr. #47 at 10 & 35). Nor, however, did he conduct any tests to determine whether defendant's complaint as to the Abilify had any validity. (Tr. #47 at 35). When offered Geodon, another second-generation

antipsychotic, defendant refused to take it.  He has continued to refuse any trials with antipsychotic medications.  (Tr. #47 at 10).

Other than the single dose of Abilify, Dr. Sarrazin has had no "interaction or ability" to observe how medication would show any appreciable benefit to defendant Dallas.  "And the history that we have from Mr. Dallas, he does not state that there was any improvement with any of the antipsychotic medications."  (Tr. #47 at 17).

Dr. Sarrazin now proposes administering second-generation drugs such as Geodon, Risperdal, or Seroquel:

> My first choice would likely be Geodon or possibly risperidone. Broadly, the second-generation antipsychotics have potential side effects of sedation, light headedness. Some people will have some stiffness with ETS, but that's very uncommon and not likely with the second-generations.  There is the potential for tardive dyskinesia, but it's extremely low and less so than the first-generation antipsychotics.  There's the potential for neuroleptic malignant syndrome which is where your body cannot control its temperature, you become very stiff, your temperature can become very high, and you can have muscle breakdown and kidney damage. That is very uncommon with the second-generation antipsychotics, but it has occurred.

> The side effect that we watch more closely with second-generation antipsychotics is in the case of Abilify, Geodon, risperidone and Seroquel, and that is diabetes or elevated blood glucoses. It has been identified in the second-generation antipsychotics, the Clozaril, Zyprexa, Seroquel, risperidone, and it appears to be less of a problem with Abilify and Geodon.  So that is one of the reasons that those are kind of our first choices, using those.

> Even if someone is on Geodon or Abilify, we have a protocol here at the Medical Center of monitoring the metabolic status of checking blood glucoses, we monitor weights, we monitor lipids in the blood. It's a close monitoring system. So we don't have the problem of the elevated blood glucoses and possible ketoacidosis. With Geodon, if Mr. Dallas agreed to take oral medications, and we addressed Geodon, it is cleared both in the kidney and in the liver, and that particular medication in people that have liver difficulties, liver problems, liver insufficiency for lack of a better word, we will sometimes reduce the dosage down and watch closely.

(Tr. #47 at 11-12).

Dr. Sarrazin acknowledged that the defendant does have hepatitis, and his liver enzymes have been slightly elevated at times throughout his stay at Springfield. In the defendant's case, they could start by administering a low dose of Risperidone or Geodon (20 milligrams twice a day) and elevate the dose as necessary over time with an initial target of 80 milligrams twice a day and see how he tolerated the medications. Geodon could present toleration problems with stomach upset, headaches or sedation, but such "nuisance" side effects usually go away fairly quickly. Risperidone may cause more difficulty with the stiffness than the Geodon. (Tr. #47 at 12-13).

Geodon is available as an immediate-acting intramuscular medication, but not as a long-acting intramuscular medication. Risperidone is available as a long-acting intramuscular, but not a short-acting intramuscular medication. If the court were to order the defendant to take antipsychotic medication, defendant's doctors hope that he would cooperate and take the medications orally. If he did not cooperate and take the medications orally, and they had to use injectable medications, they would likely use a first-generation drug, haloperidol because it is "available in intramuscular, both immediate-acting and long-acting. So if Mr. Dallas made it clear that after one or two or three immediate-acting injections of haloperidol that he wasn't going to take any oral at all, we could then use the longacting haloperidol." (Tr. #47 at 14). Initial injections of immediate-acting haloperidol would allow the doctors to determine how Dallas was tolerating that particular medication, whether there would be marked problems with the extrapyramidal side effects, and how much or whether Cogentin was necessary to help with those particular side effects. (Tr. #47 at 14).

Dr. Sarrazin also contemplated "exploring" with Seroquel – investigating how that medication was tolerated, whether it was beneficial, what the dosage was, and the length of time he

took it.  (Tr. #47 at 15).  Seroquel has similar potential side effects as risperidone and the Geodon.

*Id.*

Dr. Sarrazin testified he probably would not administer Abilify in light of the defendant's reported tolerance problems with that drug.  Statistically, the various drugs are equally effective, but individuals appear to tolerate them differently or respond to them in different ways.  In this regard, he testified:

> Q. Dr. Sarrazin, can you quantify that, is it 60 percent, 70 percent, 80 percent?
> A. Well, no. When these medications are tested in the early approval, they're looking for them to basically be better than placebo in the treatment of the anti – with these medications. So I cannot really separate them out.

According to Dr. Sarrazin, competency was restored approximately three-quarters of the time with respect to the 30 patients he has treated within the past four years with the goal of restoring competency to stand trial.  (Tr. #47 at 19).  He recalled testifying at the previous hearing that his experience in restoring competence at Springfield was about 75 to 80 percent; however, he had no data with respect to cases involving patients who, as the defendant, have had suffered from fixed delusions over a lengthy period of time.  The 75 to 80 percent figure was not limited to individuals suffering from fixed long-term delusions and did not take into account any analysis as to the side effects of the medications.  (Tr. #47 at 30-31).

Dr. Sarrazin further testified that, around the time of the initial *Sell* decision, the Bureau of Prisons "looked at individuals that required forced medication in order to achieve competency to go to trial. And in the numbers that they looked at, approximately 76 or so percent were able – that required forced antipsychotic medication were able to achieve competency to stand trial." The data

-8-

were not separated by medication or by diagnosis "other than it was forced medication of antipsychotics."  (Tr. #47 at 17).

It would take anywhere between four to six weeks on a particular dosage of the medication to determine whether there was any improvement in the patient's "thinking."  (Tr. #47 at 12).

Dr. Sarrazin was unable to give any straightforward evidence as to whether the side effects of antipsychotic medications he proposed giving to the defendant would undermine the fairness of any trial that might occur in this case.  He did testify that the Springfield facility had 24-hour nursing, correctional officers, six psychiatrists, eight to 10 psychologists, social workers and recreational therapists available to patients who were taking antipsychotic medications.  If defendant Dallas agreed to take the medications, he would be seen either once a day or twice a day, "depending on what's going on."  (Tr. #47 at 20).  In this case, the defendant's delusions, hallucinations, and disorganized thinking prevent him from working with his attorney.  The administration of antipsychotic medication should improve these symptoms.  If a medication resulted in his becoming sedated, or caused some other serious side effect, Springfield would adjust or change the medication at that time.

Specifically addressing the point that defendant Dallas suffers from hepatitis, Dr. Sarrazin testified:

> Hepatitis B or hepatitis C, infections, viral infections of the liver are unfortunately not uncommon within the Bureau of Prisons population and also unfortunately not uncommon within the population of people with chronic mental illnesses.  So, these medications have been used frequently in individuals that have chronic liver difficulties. And that's why I addressed it earlier in stating that occasionally, a reduction in the dosage of a medication is necessary...  I think I mentioned the use of Geodon and Risperdal, but Haldol also is cleared through different enzyme systems in the liver.  And it may be necessary to make adjustments in the dosage of haloperidol should that be a medication that we do use.

-9-

Our medical physicians are aware of Mr. Dallas's condition, are following it, checking laboratory studies, addressing those issues.

(Tr. #47 at 22-23).

Although the proposed medications all work quickly, they are first administered at a low dose, to make sure the patient tolerates the medication, and the dosage is slowly increased over time. According to Dr. Sarrazin, the patient must be watched for a period of anywhere between four and six weeks to see if there is some improvement. (Tr. #47 at 23). In many cases, individuals do not become competent to proceed after four months and extensions are often required. When medication is taken involuntarily, "there's a strong likelihood that an extension would be necessary to continue to monitor whether they have improvement. So we may be looking at six months to eight months. And that would also be closer to eight months if we have to switch medications." (Tr. #47 at 23).

Dr. Sarrazin ultimately opined that (1) treatment with these antipsychotic medications is likely to return defendant to a status in which he could substantially assist his attorney in his defense; (2) if not given antipsychotic medication, the defendant will remain in his current state of delusions, auditory hallucinations, and paranoia; and (3) it is medically appropriate to treat the defendant with antipsychotic medications to improve his mental state so he is able to function better and not be so distressed and paranoid with auditory hallucinations.

On or about February 1, 2007, the government served its proposed treatment plan ("Plan") (Ex. 101) on defense counsel and provided a copy to the court. Dr. Sarrazin did not have a copy of the treatment plan when he appeared to testify, but stated the treatment plan was prepared by Richard L. DeMier, Ph.D., who discussed it with Sarrazin before it was sent to the court. Notwithstanding Dr. Sarrazin's testimony that it would likely take up to eight months to see any kind of reaction or

-10-

improvement for defendant Dallas from the medications he proposes, the Plan contemplates that the defendant would take medication for 60 days, with the goal of achieving a 60-day period for the defendant to not report being bothered by hallucinations, to not exhibit behaviors that suggest hallucinations, verbalize delusional beliefs, or make statements indicating grandiose beliefs. They would continue to review the treatment plan as it evolved. (Tr. #47 at 35-36).

### 2.    Defendant's Expert

Dr. Bruce Gutnik testified that he practices general adult psychiatry, including the area of forensic psychiatry, and has practiced for 20 years in the Omaha area. Dr. Gutnik examined defendant Dallas on April 25, 2006 after reviewing records from the FBI, the U.S. District Court, Bellevue Hospital Center of Orangeburg, New York, Amarillo Healthcare Center, Dr. Joel Gold, U.S. Probation Officer Julie Souhrada-Voss, and FBI Special Agent Charles R. Boling. Based on that information, Dr. Gutnik opined that Dallas was psychotic at the time of the April 25, 2006 evaluation, suffering from paranoid schizophrenia, and was unable to participate in his own defense or in any meaningful way understand the process. In other words, he was not competent to stand trial. (Tr. #47 at 40).

Dr. Gutnik was subsequently retained by the defendant to evaluate the propriety of administering antipsychotic medications. He began drafting a supplemental report (Ex. 104) for a hearing that was initially set for December 2006, but did not complete the report because he hoped to get additional records.

Dr. Gutnik did not believe the administration of a drug or drugs would be substantially likely to render defendant Dallas competent to stand trial. Defendant's medical records from Bellevue indicated that the psychotropic antipsychotic medications that were administered there, including

-11-

Haldol, risperidone and Seroquel, created some problems.   After 40 days, his condition at discharge was the same as his condition at admission.  (Tr. #47 at 45).  Nor did the treatment at Bellevue improve the defendant's GAF, i.e., level of functioning.

Risperdal, which is the least likely of the medications to cause liver problems, had to be discontinued at Bellevue because of significantly increasing liver enzymes, implying increasing damage to the liver.  (Tr. #47 at 43-44).

Haloperidol had to be discontinued at Bellevue because of severe akathisia, which Dr. Gutnik describe as "a motor problem with agitation type problems that preclude concentration and ability to kind of think clearly. The individual is constantly in motion and can't sit still."  That kind of condition could affect Dallas' ability to stand trial.  "If someone can't concentrate on what's going on around him because he feels like he's got worms crawling in him and he has to constantly be moving to be comfortable, he can't attend to what's going on around him."  (Tr. #47 at 45).

Dr. Gutnik was of the opinion that "Mr. Dallas is likely not going to be rendered competent to stand trial" because

- He has long-standing fixed delusions, perhaps the most difficult psychotic symptom to treat with any of these medications. Usually,  hallucinations can be treated much more quickly.  The defendant's symptoms and the fact that the symptoms have been around for as long as they have, "bode very clearly in terms of prognosis."  (Tr. #47 at 46).

- One usually has to administer higher doses of medications to persons suffering from the defendant's symptoms.  Here, the patient has hepatitis B which likely will preclude very high doses of these medications, considering the evidence that his liver was reacting negatively with the Risperdal given him at Bellevue.  The drug Geodon is metabolized through the liver and there would be some risk that Geodon could cause damage to the defendant's liver.

-12-

Dr. Gutnik believed the chance of bringing Dallas to competence was significantly less than the 75 percent noted by Dr. DeMier, during the September 20, 2006 hearing.  (Tr. #47 at 53).  "The chance of bringing Mr. Dallas to competence without causing side effects that would undermine the fairness of the trial or negatively affect his physical health are considerably less."  (Tr. #47 at 54). According to Dr. Gutnik, the chance of bringing Dallas to competence is less than 50 percent, and the chance of bringing Dallas to competence without causing side effects that would undermine the fairness of the trial is also less than 50 percent.  *Id.*

Dr. Gutnik further opined that the medications proposed by the Bureau of Prisons are the appropriate medicines to treat paranoid schizophrenia and to try to treat psychotic symptoms; however, any one of the medications has the potential to cause side effects that would interfere with the defendant's ability to assist counsel in conducting a trial defense.  He noted that all medications have side effects, and it is a trial and error kind of process to find a drug that has fewer side effects and more positive effects, and to find the correct dose.  However, every one of the proposed medications can cause drowsiness, confusion, and similar problems.  Furthermore,

> The rub comes in that if they kill the guy's liver at the same time they're treating his schizophrenia, we've done him a significant disservice. In that sense, he would need to be monitored closely – and I assume he would be – for increases in liver enzymes. His liver enzymes, at least in terms of the last record I have, were elevated. And that would have to be monitored very closely because if they started going up significantly, whatever he was on would need to be discontinued.

(Tr. #47 at 47).  In defendant's case, Risperidone was discontinued at Bellevue because his liver enzymes did increase significantly.  (Tr. #47 at 48).

The treatment plan (Ex. 101) was of concern to Dr. Gutnik for several reasons.  The Axis III diagnostic impressions (which is for physical problems) omitted any mention of defendant's suffering

-13-

from hepatitis.  Dr. Gutnik was also concerned that no specific medications were mentioned in the proposed plan, only the broad general term "antipsychotic medications."  Dr. Gutnik noted that the treatment plan calls for the defendant to take psychiatric medications for 60 days and implies that he wouldn't be bothered by hallucinations for 60 days, although the plan doesn't say Dallas would stop having hallucinations; the plan implies that the defendant would not vocalize delusions for 60 days, but it does not say he would stop having them.  (Tr. #47 at 49).

In Dr. Gutnik's opinion, it was unclear whether Dallas would verbalize delusions during the 60 day period.  In his April 26, 2006 report, he noted that Dallas suffered "from well crystallized delusions believing that [he] is the protagonist in a *Truman Show* type life in which he is observed and controlled by others."  Ex. 103 at p.8.   "If he truly believes that is all *The Truman Show* – and I'm not sure that having him on television right now[2] is helping that – but if he truly believes he's part of *The Truman Show* and that all of us are actors and that this is all not real, I'm not sure that he would bother telling anybody anyway necessarily.  (Tr. #47 at 50).

Finally, Dr. Gutnik was also concerned that the interventions mentioned in the treatment plan were for a medication review as needed by a psychiatrist and medication monitoring during rounds by the clinical staff "which means nurse or whoever," and nothing else.  (Tr. #47 at 50).

### D.   Supplemental Facts – June 22, 2007 Hearing

Dr. Gutnik was recalled to testify on June 22, 2007.  He had previously diagnosed defendant as having chronic paranoid schizophrenia, noted the defendant's substance abuse,  and could not rule out the possibility of schizoaffective disorder, which implies bipolar disorder superimposed on schizophrenia.  (#70, 6:14-17).  After the February 2007 hearing, Dr. Gutnik reviewed additional

---

[2]The February 7, 2007 hearing was held by video conference call.

medical records from the Springfield Medical Center, the Leavenworth Medical Center, and the Corrections Corporation of America, which is a corporation that provides medical care to jails. His purpose in reviewing additional records was to get a better idea of how the defendant responded to medications when he was treated in the past.

At the time of the February 7, 2007 hearing, Dr. Gutnik was aware of a 40-day period where defendant was treated with an antipsychotic medication and did not respond. Additional records obtained from the Corrections Corporation of America showed that while he was in jail, the defendant was treated with Seroquel for at least four months, between February and June 2004, without any improvement. (#70, 7:2-25). The defendant was released from jail and then was returned to jail where he was given Seroquel from December 4, 2004 through April 6, 2005, again with essentially no improvement. (#70, 8:1-8).

Dr. Gutnik opined that all of the medications described by Dr. Sarrazin during the February 7, 2007 hearing run a 15 to 25 percent chance of causing drowsiness, confusion, and lack of concentration. All the drugs run a risk of decreasing the defendant's cognitive skills. (#70, 8:23-9:1). In reaching any conclusion as to whether the drugs proposed by the Springfield physicians are "medically appropriate," Dr. Gutnik considered whether the medication was effective in treating the underlying condition; whether the medication can be safely given; and whether the medication, if given, would have severe side effects. (#70, 9:2-12).

Dr. Gutnik agreed that all the drugs proposed by the Springfield doctors were medically appropriate in the general sense that they are typically used to treat paranoid schizophrenia. The administration of these drugs is not appropriate in this case, however, because of the defendant's

-15-

impaired liver function caused by hepatitis B.  All of the medications are detoxified in the liver and can negatively affect the liver, even in individuals who have healthy livers.  (#70, 9:13-10:9).

Exhibit 105 is a record of the defendant's laboratory tests, primarily blood tests, from the Springfield facility covering the period from June 2006 through April 2007.  In summary, Dr. Gutnik testified that the records demonstrated something was "going on in a negative way in Mr. Dallas's liver, that the hepatitis is becoming more active and that damage is occurring."  (#70, 11:1-12:2).  The significance of the defendant's blood test results is that all of the proposed medications have the potential to aggravate damage during hepatitis.  The medication with the lowest probability of aggravating damage is Risperdal.  Defendant had been treated with Risperdal in the past, but it had to be discontinued because it was liver toxic.  (#70, 12:9-15).  In this case, the medication that is the least liver toxic affected the defendant's liver negatively and the defendant is now showing signs of increasing hepatitis activity.  Thus, it was Dr. Gutnik's opinion that the defendant should not be treated with any of these medicines, and that none of the proposed medications are medically appropriate at this time.  (#70, 12:16-113:4).  On cross-examination, Dr. Gutnik acknowledged that defendant's hepatitis was probably in remission at one point, but it now looks like the enzymes are rising again, steadily over time.  (#70, 24:19-25:5).  When a patient with hepatitis is treated with medications that are cleared through the liver and can do liver damage, the odds increase significantly that patient's hepatitis will be exacerbated.  (#70, 25:12-20).

Dr. Gutnik also remained convinced that administering the proposed medications would not be substantially likely to restore the defendant's competence to stand trial.  On two different occasions the defendant was treated with an antipsychotic drugs for four months, and the medications did not appreciably relieve his symptoms.  The likelihood of bringing him to

-16-

competence through the use of antipsychotic medications would be less than 50 percent.  (#70, 13:14-14:6).  If the defendant did not have long-standing fixed delusions, the prognosis would be much better; however, the defendant's delusions have been noted by everyone who has evaluated him and they have not changed over time.  (#70, 14:7-21).  Dr. Gutnik reaffirmed his prior testimony that defendant's treatment with Haldol at Bellevue was discontinued because it caused akathisia, causing the defendant to become agitated and unable to focus.  The other drugs previously administered did not have the desired effect of relieving the defendant's symptoms.

Dr. Gutnik testified that he had not received any further treatment plan for the defendant since the February 7, 2007 hearing.  He is unaware of any such plan, if one exists.  (#70, 15:2).

### D.   Recommendation

This matter was remanded to the undersigned to develop the record on two of the *Sell* factors: (1) whether the administration of a drug or drugs would be substantially likely to render the defendant competent to stand trial, but substantially unlikely to cause side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense, and (2) the proposed course of treatment, consisting of the administration of antipsychotic medication, is medically appropriate in this instance.

The government bears the burden of proving each of the *Sell* factors by clear and convincing evidence.  *See United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005).  I find that the government has not met this burden.  Its primary witness, Dr. Sarrazin, had not reviewed the defendant's medical records, was not familiar with the defendant's physical condition, did not know anything about defendant's prior experiences in taking antipsychotic medications, and could only speculate that the defendant's competency might

be restored if such medications were administered. The exact medication and dosage would be determined by trial and error at the discretion of the staff at the Springfield facility.

The defense witness, Dr. Gutnik, did examine the defendant and the defendant's medical records. Dr. Gutnik discovered that previous attempts to administer antipsychotic medications were unsuccessful because they caused undesirable side effects such as akathisia and liver damage, without the desirable effect of relieving the defendant's hallucinations and fixed delusions. The data he reviewed suggested that the defendant's hepatitis was no longer in remission. Considering the nature of the defendant's mental illness, the lack of success in using antipsychotic medications in the past, and the fact that the defendant has hepatitis, it appeared to Dr. Gutnik that administering these medications would not be likely to restore competency but would be likely to cause liver damage.

While Dr. Sarrazin was able to speak in generalities, his testimony did not tend to establish that the administration of drugs would be substantially likely to render this particular defendant competent to stand trial without causing side effects that would interfere significantly with his ability to assist counsel. The so-called treatment "plan" developed by Dr. Sarrazin or his staff consisted of vague suggestions that unspecified medications be administered at unspecified doses, and that the defendant's liver enzymes would be monitored.

Based on the entire record, I find that the government has not met its burden of proof.

**IT IS THEREFORE RECOMMENDED** that the court not allow the involuntary administration of antipsychotic medication to the defendant, August J. Dallas.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection

-18-

a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

 **DATED August 13, 2007.**

 **BY THE COURT:**

 **s/ F.A. Gossett**
 **United States Magistrate Judge**