IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:06CR78 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| AUGUST J. DALLAS, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Defendant's motion for hearing to determine mental competency (Filing No. 12), the Report and Recommendation of Magistrate Judge F. A. Gossett (Filing No. 71) recommending that the Court not allow the involuntary administration of antipsychotic medication, and the government's objection (Filing No. 72) thereto.

**FACTUAL BACKGROUND**

On March 22, 2006, Dallas was charged in an Indictment with two counts of bank robbery in violation of 18 U.S.C. § 2113. (Filing No. 1.) On May 2, 2006, defense counsel[1] moved for a competency hearing pursuant to 18 U.S.C. § 4241(a), stating that Dallas was found incompetent after undergoing a psychiatric evaluation. (Filing No. 12.) On May 11, 2006, Magistrate Judge F.A. Gossett found Dallas incompetent to stand trial and committed him under 18 U.S.C. § 4241(d) to the custody of the Attorney General for hospitalization and treatment in a suitable facility not to exceed four months to determine, among other things, whether Dallas might become competent to stand trial. (Filing No. 22.)

---

[1]Dallas initially was represented by a federal public defender. On May 8, 2006, the federal public defender's motion to withdraw was granted. (Filing No. 16.) On April 21, 2006, Steven E. Achelpohl entered his appearance. Mr. Achelpohl continues to represent Dallas.

On August 7, 2006, Judge Gossett ordered a hearing regarding Dallas's treatment (Filing No. 24), and the hearing was held on September 21, 2006.  The following witnesses testified: Dr. Richart L. DeMier, a psychologist at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"); and Dr. Robert Sarrazin, chief psychiatrist at Springfield.  (Filing No. 28.)

Dr. DeMier testified that he saw Dallas regularly at least once weekly for the first few weeks that he was at Springfield.  Dr. DeMier estimated that he spent five one-hour sessions with Dallas.  (Filing No. 30 ("Tr. 1"), at 13.)  Dallas's symptoms suggested paranoid schizophrenia, a chronic illness expected to worsen absent treatment.  (*Id.*, at 5-6.)  Dr. DeMier opined that Dallas's illness hinders his competence insofar as these proceedings are concerned because: Dallas's thoughts are disorganized; it is difficult for listeners to follow his attempts to communicate, and he becomes impatient; and delusions might affect his ability to consult with his attorney.  (*Id.*, at 6-7.)  Dr. DeMier stated that the primary benefit from treatment with respect to Dallas's competence would be improved organizational thinking and removal of delusional beliefs.  (*Id.*, at 8-9.)  Dr. DeMier opined that it is "substantially likely," or "likely," that medication would render Dallas competent to stand trial.  Dr. DeMier noted, however, that the effect of medication on Dallas's competence is difficult to predict without knowing whether Dallas has had any prior treatment and, if so, the history of such treatment.  (*Id.*, at 9 & 11.)  Dr. DeMier admitted that Dallas suffers from "fixed" or consistent delusions and that such delusions can be difficult to treat.  (*Id.*, at 20.)  More specifically, Dr. DeMier testified that approximately 75 to 80% of those persons treated at Springfield are restored to competence.  (*Id.*, at 18.)

2

Dr. DeMier estimated that treatment would take approximately four to eight months. (*Id.*, at 11.) Dr. DeMier stated that he did not believe that psychiatric medications would cause unfavorable side effects that would undermine the fairness of a trial. (*Id.*, at 10.) Dr. DeMier stated that side effects associated with antipsychotic medications are generally "nuisance" effects such as stiffness, dry mouth or blurry vision, and such effects can be treated with other medications. He added that more severe side effects are generally associated with an older group of medications that would not be used in Dallas's treatment. (*Id.*, at 17.) He testified that other treatment alternatives are not available to restore Dallas's competence. (*Id.*, at 10-11, 18.) Dr. DeMier noted that Dallas did agree to take the antipsychotic medication Abilify. However, Dr. DeMier stated that Dallas took one dose, complained of side effects not usually associated with that medication, and opted not to continue the medication. (*Id.*, at 11-12.) Dallas was asked to try a second medication, and he refused to do so voluntarily. (*Id.*, at 12.)

Dr. Sarrazin testified that he interviewed Dallas for a total of one hour, and he has discussed Dallas's case with Dr. DeMier for a total of one hour. (*Id.*, at 28.) Dr. Sarrazin opined that Dallas suffers from schizophrenia, and treatment with antipsychotic medications is the treatment of choice for Dallas's condition. (*Id.*, at 29.) Dr. Sarrazin characterized the goal of treatment to allow Dallas to "become more interactive, more able to attend to his trial, more able to interact with his attorney." (*Id.*, at 30.) Dr. Sarrazin added that any side effects from the antipsychotic medications being considered are generally minor and disappear within a week or can be minimized by various strategies with respect to the dosage and timing of the medications. (*Id.*, at 29-30.) Dr. Sarrazin

stated that Dallas's complaint of becoming "ill" as a result of the medication was inconsistent with the medication and accompanied by Dallas's statement that he refused to take the medication any longer. Dr. Sarrazin added that he prefers that patients become accustomed to a new medication by taking the medication consistently for a period of three to four days. Dr. Sarrazin expressed the opinion that Dallas did not have a reaction to the medication, but rather did not want to take it. (*Id.*, at 33-34.) Dr. Sarrazin testified that if Dallas experienced more severe side-effects, appropriate measures would be taken. For example, the dosage would be changed, or Dallas would be taken off the medication(s) and rendered incompetent. (*Id.*, at 30.) He stated that Dallas's hepatitis B condition is not unusual for a person with a chronic mental illness such as schizophrenia and would be a factor in choosing a medication. (*Id.*, at 36.) Dr. Sarrazin opined that medication would render Dallas competent to assist in his defense at trial. (*Id.*, at 31.) Dr. Sarrazin testified that over a "period of time" approximately between 75 and 80% of involuntarily medicated patients achieve competency, a result he described as "very good." (*Id.*, at 32.)

No documentary evidence was offered at the hearing. (Filing No. 30.) On September 21, 2006, Judge Gossett issued a written order, finding the following:

> 1. August J. Dallas is required to receive, involuntarily, anti-psychotic medications which may render him competent to stand trial on two counts of bank robbery, which I determine to be serious offenses.
>
> 2. That such treatment is medically appropriate with a 75% success rate, and if not allowed, could result in permanent damage to Dallas.
>
> 3. The proposed medication is substantially unlikely to have any side effects undermining the fairness of the trial or further reducing Dallas' ability to communicate with counsel. Specifically I find treatment with anti-psychotic medication is appropriate and will result in minimal side effects.

4

>    4.    In this case, anti-psychotic medications represent the least intrusive alternative to further important government trial-related interests, the health of Dallas, and no alternative treatment program is available.
>
>    5.    Dallas is not a dangerous person and the sole reason for the proposed treatment program is not that he may regain competency and stand trial. On the contrary, the evidence supports a finding that the treatment is medically appropriate and if not followed could result in permanent damage to Dallas.

(Filing No. 29.)

Judge Gossett ordered that Dallas "be required to receive treatment, including the involuntary administration of antipsychotic medication for his medical well-being and to restore his competency to stand trial." (*Id.*) Judge Gossett stayed his order pending appeal.

On October 2, 2006, Dallas appealed from Judge Gossett's order, arguing that the order violated his Fifth Amendment due process rights. Specifically, Dallas argued that the evidence failed to show: the administration of antipsychotic drugs is medically appropriate; the drugs would be substantially unlikely to have side effects that undermine the fairness of the trial; and less intrusive means were not available to restore competency. (Filing No. 31.)

On appeal, the undersigned concluded that the government failed to meet the second and fourth prongs of the *Sell* test, respectively: 1) the administration of a drug or drugs would be substantially likely to render Dallas incompetent to stand trial, but substantially unlikely to cause side effects that will interfere significantly with his ability to assist counsel in conducting a trial defense; and 2) the administration of antipsychotic drugs is medically appropriate. (Filing No. 34.) More specifically, with respect to the second *Sell* factor:

5

> Absent testimony from Dr. Sarrazin regarding specific medications as well as his personal experience with similar cases using those medications, it is difficult to determine the likelihood that Dallas will achieve competency. The task is made more difficult in light of the lack of history of any of Dallas's past treatment efforts, if any, and the fact that Dallas appears to suffer from "fixed" or consistent delusions that the medical professionals acknowledge are difficult to treat. The testimony describing a 75-80% success rate appears to refer to the general population at [the United States Medical Center for Federal Prisoners in Springfield, Missouri], regardless of the mental illness at issue or the specific medication used.

(*Id.* at 10-11.)

Regarding the fourth *Sell* factor, the Court stated that because the record lacked information regarding specific medications that could be used to treat Dallas, it could not determine "whether the proposed course of treatment, consisting of the administration of antipsychotic medicine, is medically appropriate." (*Id.* at 11.)

In light of these deficiencies, the Court remanded the matter to Judge Gossett for further evidentiary hearing. (Filing No. 34.)

At a hearing held before Judge Gossett on February 7, 2007, Dr. Sarrazin testified that antipsychotic medications are the treatment of choice for Dallas's condition of chronic paranoid schizophrenia. (Filing No. 47 ("Tr. 2"), at 6.) He acknowledged that delusions can be more resistant to treatment than other symptoms such as hallucinations. (*Id.*, at 27.) He testified that such medications are medically appropriate for Dallas and would improve his symptoms. (*Id.*, at 6-8.) Dr. Sarrazin explains the difference between first-generation and second-generation antipsychotic medications. He explained that the second-generation medications are newer, better tolerated, have fewer side effects, and are very effective. Dr. Sarrazin testified that he would look at using the following second-generation medications with Dallas: Risperidone; Geodon; or Seroquel. (*Id.*, at 9.)

Dr. Serrazin noted that Dallas was admitted to the Bellevue Hospital Center ("Bellevue") in February of 2004, for approximately six weeks. (*Id.* at 9, 25.)  Dr. Sarrazin stated that, according to Dallas, while at Bellevue he was given the following antipsychotic medications: Haloperidol ("Haldol"), a first-generation drug; and the second-generation drugs Risperidone and Seroquel.  Dallas told Dr. Serrazin that he remained on Seroquel when he left the Bellevue facility.  (*Id.* at 9, 26.)  Dr. Serrazin admitted that he has not reviewed any reports or other records from the Bellevue facility that were provided to him.  Rather, his information came solely from Dallas.  Dr. Serrazin testified that he was unaware of Dallas's progress, if any, on the medications administered to him at Bellevue, admitting that this information is relevant to any drugs that would be administered to Dallas in the future.  (*Id.*, at 26-27, 29-30.)  Dr. Serrazin again referred to Dallas's one-time trial of Abilify, a second-generation antipsychotic medication, and his refusal to continue Abilify, Geodon, or any other antipsychotic medications.  (*Id.*, at 10.)  Dr. Serrazin stated that his preferred medications for future treatment of Dallas would be Geodon or Risperidone.  He noted that both are metabolized through the liver and therefore can affect liver function. (*Id.*, at 29.)  He described possible side effects of those second-generation medications. (*Id.,* at 11.)  He testified that with Geodon, Dallas would have to be monitored closely for liver problems, as he has hepatitis.  He stated that Dallas would be started on a low dose that would gradually be increased, and that it would take between four to six weeks on a dose of a particular medication to determine whether Dallas's ability to think clearly has improved and to ensure that the medication is being tolerated.  (*Id.,* at 12.)  Dr. Serrazin testified first that Risperidone is cleared primarily through the kidneys and that liver

7

problems are unaffected by Risperidone, and then later that it might affect the liver, albeit less than other medications. (*Id.*, at 13, 29.) Dr. Serrazin did not know how Dallas's liver enzymes were affected while he was at Bellevue. Geodon and Risperidone are oral medications. (*Id.,* at 13.) Dr. Serrazin noted that Haldol, however, may be given by injection once every two, three or four weeks, in either an immediate-acting and a long-acting form. He stated that if Dallas would not cooperate in taking oral medication, he would likely be given injectable Haldol. (*Id.*, at 14.) Dr. Serrazin stated that he would also consider again administering the second-generation drug Seroquel to Dallas, and he would investigate how Dallas tolerated the medication and whether it was beneficial to him when he took it in the past. (*Id.*, at 15.) Dr. Serrazin repeated that the Federal Bureau of Prisons data indicates that approximately 76% of those forced to take medication at Springfield achieved competency to stand trial. However, Dr. Serrazin acknowledged that a breakdown of that figure showing the various diagnoses or medications was not available. (*Id.*, at 17, 31.) Dr. Serrazin has treated hundreds of individuals with conditions similar to Dallas's, and he testified that in his experience treating those individuals, antipsychotic medications in general have been successful in restoring competency about 75% of the time. (*Id.*, at 19.) Dr. Serrazin stated that staff, including nurses, medical officers, physician assistants, and one physician are available during the day. He testified that a medical officer, a physician, a psychiatrist or psychologist are on call nightly. (*Id.*, at 20.) Dr. Serrazin testified that hepatitis is common in the Bureau of Prison inmate population, and therefore antipsychotic medications have been used frequently in individuals with liver complications. (*Id.*, at 22.) In the cases of the approximately thirty persons that Dr.

8

Sarrazin has treated with a condition similar to Dallas's, he stated that the medications work quickly and that dosages need to be gradually increased between four to six weeks. (*Id.*, at 23.) Often an extension of time beyond four months is needed to achieve competency, and particularly in cases involving the involuntary administration of medication a period of six to eight months is not unusual. Dr. Serrazin opined that treatment with antipsychotic medications is likely to render Dallas competent to assist in his defense. (*Id.*, at 24.) Dr. Serrazin testified that when Dallas complained of side effects after receiving a dose of Abilify, he did not conduct any tests to determine the validity of Dallas's complaints. (*Id.*, at 34.)

At the same hearing, Dr. Bruce Gutnik testified. Dr. Gutnik is a general adult psychiatrist who also has practiced in the area of forensic psychiatry for approximately twenty years in Omaha, Nebraska.[2] Dr. Gutnik testified that he evaluated Dallas on April 25, 2006, and prepared a written report. (*Id.*, at 39, Ex. 103.) Prior to the evaluation, Dr. Gutnik reviewed records from the Federal Bureau of Investigation, this Court, the Bellevue Hospital, Amarillo Healthcare Center, Dr. Joel Gold, and a federal probation officer. He then saw Dallas in his office for close to two hours and performed a complete psychiatric history and mental status examination. He diagnosed Dallas as psychotic and suffering from chronic paranoid schizophrenia, noting that he could not rule out schizoaffective disorder that implies bipolar disorder superimposed on schizophrenia. Dr. Gutnik also noted substance abuse. He concluded that Dallas was incompetent to stand trial. (*Id.*,

---

[2]Dr. Gutnik's curriculum vitae is in the record. (Ex. 102.)

9

at 40.) Before writing a supplemental report[3] on Dallas, Dr. Gutnik reviewed the following additional records: more detailed records form the Bellevue Hospital, including a discharge note; screening notes and evaluations from the Rockland Psychiatric Center ("Rockland");[4] an intake report from the Federal Bureau of Prisons psychology data system; progress notes and laboratory results from Springfield; and a transcript of the initial *Sell* hearing in this Court. (*Id.*, at 42.) After this expanded review, Dr. Gutnik opined that the likelihood of Dallas achieving competency to stand trial after drug treatment without causing side effects that would undermine the fairness of the trial is "fairly low," which he quantified as under 50%. (*Id.*, at 43, 54.) Dr. Gutnik reached this opinion for the following reasons: Risperdal, which is the least drug likely to cause liver problems, resulted in significantly increasing liver enzymes in Dallas; Seroquel had no effect on Dallas after forty days; Haldol had to be discontinued because of severe akathisia, a motor problem that precludes concentration and one's ability to think clearly. (*Id.*, at 46.) Dr. Gutnik also opined that the chance of bringing Dallas to competency without causing side effects such as mental confusion is less than 50%. (*Id.*, at 54.) Dr. Gutnik did not believe that Dallas can be rendered competent to stand trial, noting that he has long-standing fixed delusions, which are likely the most difficult psychosis sought to be treated by antipsychotic medications. In order to attempt to treat an individual with Dallas's condition, higher doses must generally be given. Larger doses are precluded in Dallas's case because of the evidence indicating that Risperdal exacerbated his Hepatitis B condition. Dr. Gutnik noted that

---

[3]The supplemental report is in the record. (Filing No. 104.)

[4]Dallas was transferred to Rockland for long-term psychiatric care on March 30, 2004, after being at Bellevue for forty days. (*Id.*, at 50-51.)

10

Geodon carries the same risk because it is also metabolizes in the liver. (*Id.*, at 46.) Dr. Gutnik also opined that all of the medications discussed can cause drowsiness and confusion that could inhibit Dallas's ability to participate in his defense. (*Id.*, at 47.) Dr. Gutnik summarized his opinion by stating: The rub comes in that if [the antipsychotic medications] kill the guy's liver at the same time they're treating his schizophrenia, we've done him a significant disservice." (*Id.*, at 48.) Dr. Gutnik was concerned with Springfield's treatment plan[5] because the plan failed to reflect hepatitis as a physical problem, and the record only referred to antipsychotic medications in general rather than to specific medications. (*Id.*, at 49; Ex. 101.) Dr. Gutnik was also specifically concerned with these aspects of the record: 1) the plan's expressed goal is for Dallas not to report hallucinations, delusions, or grandiose beliefs for 60 days rather than a goal that he would no longer experience hallucinations, delusions, or grandiose beliefs; and 2) medication reviews would be done by medical staff rather than by a psychiatrist. (*Id.*, at 49-50.)

At a subsequent hearing held before Judge Gossett on June 22, 2007, Dr. Gutnik again testified. He testified that since the February hearing he reviewed additional records from the Corrections Corporation of America, Springfield, and the federal prison in Leavenworth, Kansas. Dr. Gutnik reviewed those additional records in order to obtain a better picture of how Dallas responded to medications given to him in the past. (Filing No. 70 ("Tr. 3"), at 7; Exs. 1, 105.) Dr. Gutnik stated that Dallas was treated as follows: for four months between February and June of 2004, with Seroquel, a potent antipsychotic drug, with no improvement in Dallas's condition; and again for four months from December 4,

---

[5]Springfield's proposed treatment plan is in the record. (Filing No. 101.)

11

2004, until April 6, 2005, with Seroquel, with no improvement in Dallas's condition. (*Id.*, at 7-8.) Dr. Gutnik stated that the medications described in the previous hearing by Dr. Sarrazin all have a 15-25% chance of causing side effects that would interfere with Dallas's cognitive skills, such as drowsiness, confusion, and difficulty with concentration. (*Id.*, at 8.) Dr. Gutnik opined that the medications administered at Springfield are medically appropriate to treat paranoid schizophrenia. However, he stated that the medications are inappropriate for a patient with Hepatitis B, such as Dallas, because they can aggravate the liver condition and further damage the liver. (*Id.*, at 10.)

Dr. Gutnik reviewed laboratory results from tests administered to Dallas at Springfield. Dr. Gutnik testified that those test results showed that Dallas's Hepatitis B was worsening and his liver damage was increasing. For example, Dr. Gutnik referred to a test that showed that on June 9, 2006, Dallas's result of 59 showed some elevation in liver function, noting that the normal range is between 11 and 55. In August of 2006, the result was 76, and by April of 2007, the number was nearly 100. (*Id.*, at 11.) Dr. Gutnik also noted that Dallas had to be taken off Risperdal, the medication with the least impact on liver function, because it negatively affected his liver. Therefore, Dr. Gutnik opined that Dallas should not be treated with any antipsychotic medications. (*Id.*, at 12-13.) Dr. Gutnik repeated his conclusion that the possibility of restoring Dallas to competence so that he could participate in his own defense is "significantly less than" 50%, based on the evidence that Dallas's condition remained the same after two four-month periods of being treated with an antipsychotic medication. (*Id.*, at 13-14.) Dr. Gutnik added that the prognosis would likely be better if Dallas did not suffer from long-standing fixed delusions. (*Id.*, at 14.)

Judge Gossett issued a Report and Recommendation, in which he concluded that the government had not met its burden under *Sell*. Judge Gossett summarized Dr. Gutnik's testimony, noting that Dr. Gutnik had reviewed Dallas's medical records. Judge Gossett noted the following observations of Dr. Gutnik: Dallas's hepatitis was no longer in remission; the nature of Dallas's illness; the lack of success in improving Dallas's mental condition in the past with antipsychotic medications; and antipsychotic medications would not likely restore mental competency but would likely increase liver damage. In contrast, Judge Gossett noted that Dr. Sarrazin's testimony, based largely on generalities and absent a review of Dallas's medical records and laboratory results, failed to show that Dallas would likely be rendered competent without causing side effects that would interfere significantly with Dallas's ability to consult with counsel. Judge Gossett noted that Dr. Sarrazin's testimony referred only vaguely to antipsychotic medications and a general monitoring that could be undertaken with respect to Dallas's liver condition. For these reasons, Judge Gossett recommends that the Court not allow the involuntary administration of antipsychotic medication to the Defendant.

The government objects to the Report and Recommendation. (Filing No. 72.) In its accompanying brief, the government argues that Judge Gossett failed to take into account: the availability of medications to lessen or prevent the occurrence of side effects; and the medical plan's intention to monitor and treat Dallas's hepatitis concurrent with the administration of antipsychotic medications. (Filing No. 73.)

The Defendant responded, summarizing the evidence and noting that the Springfield physicians recommend the administration of involuntary medications based on an incomplete investigation of the issue. (Filing No. 74.)

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3(a), the Court shall make a de novo determination of those portions of the report, findings, and recommendations to which the Defendant has objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## DISCUSSION

One has a Fifth Amendment due process interest in rejecting the administration of antipsychotic medication. *Washington v. Harper,* 494 U.S. 210, 221-22 (1990). Before this Court may authorize the involuntary administration of antipsychotic medication to render the Defendant competent to stand trial, the government bears the burden of showing each of the following factors discussed below:

> (1) important government interests are at stake; (2) involuntary medication is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial; (3) involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and (4) the administration of the drugs is medically appropriate.

*United States v. Ghane,* 392 F.3d 317, 319 (8th Cir. 2004) (citing *Sell v. United States,* 539 U.S. 166, 180-82 (2003), hereafter referred to as the "*Sell* test.").

The focus in remanding this matter to Judge Gossett for further proceedings was on the second and fourth factors of the *Sell* test.

In *United States v. Gomes,* 387 F.3d 157, 161 (2d Cir. 2004), the court concluded that a 70% chance of restoring a defendant's competence through antipsychotic medications was a sufficient likelihood of success to satisfy the second factor of the *Sell*

test. The *Gomes* court noted in particular the district court's reference to the Bureau of Prisons' 70% success rate in restoring competence with antipsychotic medication, both on voluntary and involuntary bases. *Id.* at 161-62. Not all courts, however, have viewed such statistics as sufficient. *Rivera-Guerrero,* 426 F.3d at 1136 & 1140 (stressing the Supreme Court's requirement under *Sell* of the importance of a complete factual record including details of drugs to be used as well as their side effects and appropriateness).

Interpreting *Sell*, other courts have required detail with respect to the specific medication proposed to be administered to an incompetent defendant. *See, e.g., United States v. Evans,* 404 F.3d 227, 240 (4th Cir. 2005) (stating that absent such information the government could not prove the second prong of the *Sell* test). And the *Sell* Court specifically stated with respect to the second prong of its test:

> [A court] must find that administration of *the drugs* is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of *the drugs* is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

539 U.S. at 181 (emphasis added).

Dr. Gutnik is the only witness whose testimony includes sufficient details with respect to the medications given, their side effects, and the lack of their effect on Dallas's competency. Dr. Gutnik reviewed past medical records in preparation for his testimony. In contrast, Dr. Serrazin did not review past medical records provided to him. His testimony was based solely on generalities. He was only able to describe antipsychotic medications, their effects on competency and their side effects in broad terms without specific reference to Dallas's own mental competency or his liver condition. Dr. Serrazin

15

was only minimally prepared to testify in this case. Therefore, the Court credits Dr. Gutnik's testimony as reliable and finds Dr. Serrazin's testimony unreliable.

Based on Dr. Gutnik's testimony, it is clear that there is less than a 50% probability that Dallas's mental competency can be restored to the point of being able to assist in his defense. It is also clear that significant issues exist with respect to side effects of any antipsychotic medication, in particular side effects that would interfere with Dallas's concentration and his liver condition. Medical records document the lack of improvement of Dallas's mental competence and the negative effects of the drugs on Dallas's liver when antipsychotic drugs have been administered in the past.

The government objects to Judge Gossett's Report and Recommendation because it did not take into account medications that could be administered to counteract side effects that might occur upon Dallas's taking of antipsychotic medications. The burden is on the government, and the government presented no evidence regarding any specific medications available for this purpose, the suggested protocol for administering the medications, any witnesses' prior experience with those drugs, or the likelihood of their effectiveness given Dallas's condition.

Lastly, the government objects that Judge Gossett did not discuss the Springfield medical plan's intention to monitor and treat Dallas's hepatitis while treating his mental condition. The Court shares the same concerns as Dr. Gutnik. That is, the Springfield written plan fails to mention hepatitis in the statement of Dallas's diagnosis or anywhere in the plan. The plan includes no indication that Dallas's hepatitis would be monitored. To the extent that any monitoring would occur, the plan states that routing monitoring would be done by medical staff rather than by a psychiatrist.

Therefore, based on Dr. Gutnik's thorough testimony, the Court finds: the likelihood of Dallas achieving mental competency after several months of receiving antipsychotic medications is less than 50%; the administration of antipsychotic drugs would result in undesirable side effects, for example a negative effect on Dallas's ability to concentrate, and increased damage to his already damaged liver; and, taking all factors into consideration, the administration of antipsychotic medications is not medically appropriate.

## CONCLUSION

For the reasons discussed, the government has not met its burden. Therefore, involuntary medication will not be administered to the Defendant, August J. Dallas.

IT IS ORDERED:

1. The Report and Recommendation of Magistrate Judge F. A. Gossett (Filing No. 71) is adopted in its entirety;

2. The Defendant's motion for hearing to determine mental competency (Filing No. 12) is granted;

3. The government's objections (Filing No. 72) to the Report and Recommendation are denied;

4. Involuntary medication will not be administered to the Defendant, August J. Dallas. and

5. A copy of this order shall be sent to Dr. Richard DeMier and Dr. Robert Sarrazin at the U.S. Medical Center for Federal Prisoners, P.O. Box 4000, Springfield, Missouri 65801-4000.

DATED this 27th day of September, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge